**TURNER v. PEOPLES INDUSTRIAL LIFE INS. CO.**

No. 16909.

Court of Appeal of Louisiana.   Orleans.

April 18, 1938.

**436**

Normann & Bethea and Harold M. Rouchell, all of New Orleans, for appellant.

Herman L. Midlo, of New Orleans, for appellee.

JANVIER, Judge.

On November 28, 1921, the Peoples Benevolent Industrial Life Insurance Company of Louisiana issued, on the life of Prenella Jones Turner, a policy in the sum of $85.50. Later the name of the said company was changed to "Peoples Industrial Life Insurance Company," which is the name under which it has now been sued. The policy contained a provision to the effect that "a sum equal to 2 per cent. of the amount shown as death benefit in schedule above will be added to the death benefit above mentioned for each full year this Policy is maintained continuously in force, until said additions equal fifty (50) per cent. of the death benefit referred to." Premiums were paid to May 13, 1935, although on various occasions—apparently five in number—there were lapses and subsequent reinstatements. By indorsement subsequent to issue, Horace Turner, the husband of the insured, was named beneficiary, and he, after the death of the insured on January 20, 1937, made claim for the proceeds, including the additions which he alleged had accumulated.

Plaintiff, while admitting that at the time of the death there was a delinquency in premium payments, alleged that there had accumulated a reserve to which the policy was entitled, which, if applied to the purchase of extended insurance in accordance with the requirements of Act No. 193 of 1906, was sufficient to extend the policy beyond the time of the insured's death.

Defendant company admitted the issuance of the policy and the change in beneficiary and the payment of premiums from the date of issuance to May 13, 1935, though it pointed to the various lapses as interrupting the life of the policy and as thus depriving the beneficiary of the right to any additions in any event, and it denied any liability at all under the policy, maintaining that, at the time of the final lapse on May 13, 1935, the policy had not accumulated a reserve sufficient to carry it, at the company's rates, to

the day of the death—1 year, 7 months, and 20 days after the said lapse.

In the court, a qua, there was judgment for $98.37, that being the net amount found to be due after adding to the face of the policy the accumulated additions and after deducting certain indebtednesses. The judgment also included $25, which was awarded as the fee of an actuarial witness called to the stand by plaintiff to give expert testimony. From this judgment, defendant has appealed.

It is necessary that we first consider the issue presented by plaintiff's claim that there should be added to the original face value of the policy 2 per cent. for each year during which it remained continually in force because it is conceded that, to some extent, on a determination of that issue also depends the question of whether there has accrued a sufficient reserve to "carry" the policy from the date of the final lapse beyond the day of the death.

The stipulation, it will be noticed, requires that, if the added benefit is to be earned, the policy must remain "continually" in force. It is not denied by plaintiff that on the various occasions shown on the face of the policy there had been temporary lapses. But it is contended that in each case there had been a reinstatement, or revival of the policy, and that, therefore, whenever each revival was assented to by the company, the effect thereof was to continue in force the original policy and not to bring into existence a new contract; that during each period of lapse the policy was continued in force by the extended insurance statute; and that, therefore, the policy which is now sued on, in spite of the lapses, remained continually in force during the entire period.

In Johnson v. Life Insurance Company of Va., 169 So. 159, we discussed at length the question of whether a life policy, which has been forfeited for nonpayment of premiums and has been reinstated, constitutes a continuation of the original contract, or evidences a new one, and we reached the conclusion that the answer to that question depends upon whether, after the forfeiture, there remains in the policyholder any right to insist upon reinstatement. We said that, if there is a right to demand reinstatement, the exercise of that right brings about merely a continuance of the original contract, but that, if there is no such right, then the insurer, acting on the new inducements

and the new considerations offered, exercises its freedom of right to contract and that, therefore, the policy becomes a new contract even though the original document may be used to evidence that new contract.

In that case we found a policy which had been issued before the enactment of the extended insurance statute of 1906. The policy had been forfeited in 1919 and had been reinstated by the insurance company and had again lapsed in 1933. When the insured died in 1935, the beneficiary contended that the policy, at the time of the lapse in 1933, had accumulated a reserve sufficient, because of the provisions of the extended insurance act of 1906, to extend the policy beyond the date of the death. But the insurer maintained that that statute had no application because of the fact that the policy had been issued prior to its enactment. We found that because the policy, by its terms, had become absolutely void in 1919, the reinstatement at that time could not have been insisted upon and that, therefore, the voluntary reinstatement· constituted a new contract and that it—the new contract—was governed by the provisions of the act of 1906, since the new contract had come into existence long after the effective date of that statute.

■ In the case at bar the policy was issued after the enactment of the extended insurance statute and it was, therefore, governed by that statute, and, while we are shown no contractual policy stipulations giving to the insured the right, in case of lapse, to ᐧ demand reinstatement, we do find that, because of the effect of the statute as it was interpreted in Watson v. Metropolitan Life Insurance Co., 183 La. 25, 162 So. 790, the policy, when it lapsed for the first time in 1929, was entitled to automatic extension for so long a time as the accumulated reserve of some eight years would pay for on the premium rate basis of the company. Since the insurance company obviously, during that extended period, agreed to a reinstatement of the policy on its original basis, it is apparent that at no time during that so-called lapse was the policy not in force.

■ The same may be said of each of the other four lapses. There was a right in the insured in each instance to insist upon the granting of the extended insurance. In fact, as we have said, the extended insurance was automatically effect-ed by law, and, consequently, when the company in each instance agreed to a reinstatement, it was not consenting to a new contract, but was merely agreeing that, instead of the extended insurance to which the insured was entitled by law, it would re-establish the original contract at the original rate. Thus the contract which was in existence at the time of the final lapse on May 13, 1935, was the original one which had been entered into in 1921 and that contract had been continuously in force since the date of issue, since, because of the effect of the extended insurance statute, there was never a time between the date of original issue and the date of final lapse at which it was not in force.

■ An examination of the policy and of the indorsements thereon shows plainly that, at the time of the first lapse, the policy had actually been in existence for more than 8 years. Therefore, under Act No. 193 of 1906, which we shall later discuss, there had accumulated a reserve which would have carried the policy for an undetermined length of time, and we assume, in the absence of proof to the contrary, that when the company assented to the reinstatement of the policy it did so because the extension would have carried the policy beyond the date on which the reinstatement or revival was assented to. Therefore, when the back premiums were paid and the original policy was reinstated, it is obvious that there was continued protection, even during the period of the lapse. From the issuance of the policy to the time of the final lapse, there was no period during which collection could not have been made on the policy had death occurred.

The case is not analogous to that which confronted the Supreme Court of Oklahoma in Continental Casualty Company v. Clark, 70 Okl. 187, 173 P. 453, 456, L.R.A. 1918F, 1007, for there the policy provided that the additional insurance should be granted for each year which the policy should remain in force "without default in payment of premium." In the case at bar we notice that the policy condition was that it should remain "continuously in force." It may well be that a policy remains continuously in force even though, during its life, there has been a default or delay in the payment of premium. Thus, in the present case, though there seem to have been at least five defaults in the

payment of premiums, there was never a time at which the policy was not in force.

Counsel for defendant contend that, in any event, plaintiff cannot contend that the additional insurance has been earned because plaintiff has not shown affirmatively that the policy has been continuously in force, and counsel maintain that the burden of proof is on the plaintiff to show this. They cite the language used by the Supreme Court of Oklahoma in the Clark Case, supra:

"This clause of the contract being for the benefit of the insured and inuring to him only upon condition that he perform certain acts as specified in the contract the burden was naturally upon plaintiff to show by the evidence that the premiums had been paid without default."

But the contract which was there involved was an accident policy, which was renewable from year to year and was not written for the life of the insured, and obviously the mere presentation of the policy did not raise a presumption that it had been in force since its original issue, nor that there had been no default in the payment of premiums, and the court so held.

■ The policy before us presents an entirely different situation. It is a life policy intended, when issued, to remain in force during the entire life of the insured, and we think that, where the same life policy which was originally issued is admitted to be in force at the time of the final lapse, there is a presumption that it was continuously in force during all that time and the burden should be on the insurer to show the contrary. That subject to the legal contention made, the policy was admittedly in force from its original issue to the time of the final lapse, is evident from the following excerpt from the testimony:

"Q. It has been admitted that this policy has been in full force and effect from November 28, 1921, to May 13, 1935 * * A. (By Mr. Normann, counsel for defendant) Yes, that's correct."

Furthermore, the evidence to prove that a policy has been continuously in force is often difficult to obtain on the part of a plaintiff who is not the insured, but merely the beneficiary. Where a policy has been in force for years, many premiums have been paid. Receipts may have been lost. The insured has died and frequently no other person knows when and how the premiums were paid. To require the beneficiary to make this proof would often place on that beneficiary too great a burden. The insurer, on the other hand, must necessarily keep complete records and should have no difficulty in proving the actual facts. The duty of proving that such a policy has not been in force should be, and we think is, upon it.

We therefore feel that, under the policy stipulation, at the time of the ultimate lapse there had accumulated an additional value of 2 per cent. per year for the 13 years during which the policy had been in existence and that, therefore, at that time the gross value of the policy was $85.50, plus $22.23, or $107.73 in all. There were, as has been shown, certain small loans on the policy which, according to the expert tendered by plaintiff, amounted, with interest accumulations, to $9.36, so that the net amount which, for the moment, we will consider as being due on the policy was $98.37.

A most important issue arises over the divergent opinions of the actuarial experts as to the method to be followed in determining what is the amount of the reserve which the policy had earned during the more than 13 years of its existence. Mr. Keetch—placed upon the witness stand by plaintiff—explained the mathematical processes by which he concluded that the net reserve to which, on the day of the lapse, the policyholder was entitled was $6.68. He testified that at that time the face of the policy was $98.37 and he computed the term of extended insurance for which the net reserve would pay as 6 years and 88 days. This, of course, is more than sufficient to carry the policy beyond the date of death.

Mr. Barthe, on the other hand, testifying on behalf of defendant, presented and explained calculations which, if he properly applied the law and the mathematical formulas, left, on the day of the lapse, a net reserve of $1.15. He testified that at the company's rates that amount would carry the amount due under the policy, which he fixed at $85.50, for 244 days, obviously an insufficient extended period to include the date of death.

The essential difference between these two gentlemen is that the one, Keetch, on behalf of the plaintiff, maintains that the reserve, in case of lapse, must be apportioned to the policyholder on identically

the same basis which has been followed in theoretically accumulating the reinsurance reserve which, by Act No. 114 of 1898, is required to be set up, whereas the other, Mr. Barthe, though conceding that the reinsurance reserve which the company must set up on its books is governed by the act of 1898 and, therefore, must be theoretically accumulated on the basis set forth in that act, contends that, where there is a lapse which entitles the policyholder to be given the extended insurance purchasable by the actual reserve to which the policy is entitled, that reserve is not controlled by the provisions of the act of 1898, but is governed by the provisions of Act No. 193 of 1906, and that the company, following this latter statute, may apportion the reserve to the policyholder in accordance with the methods actually adopted by the company based on its actual loss experience.

This latter contention at first impressed us as untenable. The act of 1898 seemed to us to require an insurer, governed by its provisions, to set aside from each premium payment a certain portion to be designated as reserve earned by that policy and to require, also, that that reserve be allowed to accumulate for the benefit of the policyholder and it seemed strange indeed that some other statute, when the time comes to turn that reserve over to the policyholder, should permit an insurer, which, on the basis of the first statute, has accumulated the reserve, to make an allotment to the policyholder of a lesser amount and on a different basis.

But defendant's astute counsel call attention to what now appears to be a very obvious fact; that the act of 1906 (No. 193), which is the statute which, in the case of lapses, requires that the reserve shall be applied to the purchase of extended insurance, provides that the reserve applicable to such a purpose shall be figured not on the basis required by the act of 1898 for the accumulation of the theoretical reinsurance reserve, but shall be figured in accordance with the provisions of Act No. 193 of 1906, under which latter and later act the reserve on such policy is "computed according to the standard adopted by said company" and under which the extended insurance which is purchased is paid for at premium rates fixed in accordance with "the standard adopted by the company."

The act of 1898 makes no reference to a standard which the company may adopt nor does it have reference to the actual reserve accumulated to the credit of any one policy. That act is a general one, controlling many features of life insurance activities, and a study of it shows that the "re-insurance reserve" to which it refers and which it requires means not the individual reserve to which any one policy is entitled, but the general reserve account which every such company is required to set up on its books before it is permitted to apply any of its resources to the payment of dividends. Section 3 of the act of 1898 provides the conditions under which such a company may pay dividends to its stockholders. It requires that, before any such dividends may be paid, the company must devote the proper amount of its income to its overhead and to other necessary expenses and must then set up a reinsurance reserve, which it must figure in accordance with the provisions of section 2 of the act, and that then and only then may it devote any portion of its income to the payment of dividends. In other words, that, whatever may be the actual experience of the company, it must set up this fictitious book reserve and, it follows, must have sufficient assets to take care of this reserve before it can pay dividends.

Act No. 193 of 1906, however, has no reference whatever to that book reserve which is contemplated by the act of 1898. The reserve contemplated by the act of 1906 is the reserve to which each individual policyholder is entitled by reason of the actual loss and operating experience of the company. When it becomes necessary that an insurer allot to a policyholder, as a premium payment for extended insurance or as a surrender value, the reserve which that particular policy has earned, that apportionment or allotment necessarily must be made on the basis of the actual experience of the company because any other allotment or apportionment might give to that policyholder too much, if the company's experience has not produced in actual reserve an amount equal to that fictitiously set up as a book reserve in accordance with the act of 1898.

Suppose, for instance, that, as a result of compliance with section 2 of the act of 1898, the insurance company has set up on its books a reserve of, say, $100,000, but that its experience has been bad and

the actual amount which it has on hand for reserve is substantially less than this amount—say $50,000. If such a company in such situation is required to pay.to the policyholder as a surrender value, or as a premium for extended insurance, the full amount of reserve in accordance with the fictitious reserve .set up under the act of 1898, the actual reserve will thereby be depleted to such an extent that the remaining policyholders obviously will not be able to secure, as their pro rata of the actual reserve, a proportion as great as that which has been allotted to the first-mentioned policyholder. To illustrate further, if a company has set up on its books, in accordance with the statute of 1898, a reserve, say, of $100,000, but its experience has been so bad that the actual reserve which it has is, say, $500, and a policyholder entitled to a cash surrender value or entitled to extended insurance can be given the reserve to which he claims his policy is entitled by reason of the act of 1898, it might well be that that entire actual reserve would have to be devoted to the satisfaction of that particular policyholder, which would leave nothing at all as a reserve for other policyholders. In fact, this result is indicated in the evidence and counsel for plaintiff unwittingly shows that this exact result may take place if the method of allotment contended for by him should be followed.

In the. case of Decoy v. First National Life Insurance Co., 184 La. 632, 167 So. 172, the Supreme Court considered the question of the proper allocation to policyholders of accumulated reserve. There it was contended that the company might allot to policyholders the actual net reserve on any basis adopted by the company and, in accordance with that basis, the company contended that it had taken its total cash reserve and apportioned it equally among all of its policyholders. The Supreme Court held that that method could not be followed because that would be an unfair way of giving to one policyholder a preference over another. The court said that obviously policies which had been in existence for years were entitled to a greater proportion of the reserve than those which had been in existence for only a short time. But the significant thing about the decision is that in it the court did not hold that the allotment must be made on the basis on which the reserve had theoretically been accumulated, but said that it could be made on any basis

adopted by the company, provided that method was actually followed and provided that method was equally fair to all policyholders.

■ We conclude that, in such case as is presented here, an insurance company may apportion its actual net reserve on any basis adopted by it provided it show that it has actually followed that basis which is founded on its actual experience and provided that that basis be equally fair to all policyholders.

We now pass to a consideration of whether the basis adopted by the company in the present instance—conceding it to be fair equally to all policyholders and conceding that it has actually been adopted—would not produce to the policy in question a reserve sufficient in amount to carry it from the day of the lapse beyond the day of the death.

■ We feel that the burden is on the insurer, which has adopted a basis different from that on which it set up a reserve on its books, to show that the reserve on the basis actually adopted by it is not sufficient to carry the policy beyond the date of death.

When we examine the testimony of Mr. Barthe, the expert who testified on behalf of defendant, we find many obvious errors and miscalculations. First—and most important of all—he did not take into consideration the increased value of the policy, and there can be no doubt that, had he done so, some addition to the reserve would have resulted. He admits this, stating that "compared with the formula for an increasing policy my formula would give·less reserve." When asked whether, if he had added the additional value to the policy and had then figured the reserve, his "figures would have been sufficient to extend this policy," he answered: "I wouldn't say that, but they may have been." In fact, counsel for defendant criticize the result reached by plaintiff's expert for the reason that he did take into consideration the increased value. In their brief they say that the testimony of this witness "must be disregarded altogether as of having no value to the court, since his calculations are predicated upon the increased benefits. * * *" Since we find that the claimant is entitled to the increased benefits, it necessarily follows that the testimony of Mr. Barthe, who did not take into consideration these increased benefits, to use counsel's own language, "must be disregarded. * * *"

We find, also, that Mr. Barthe, in his calculation of the interest due on the loans which were secured by the policy, stated that he had charged interest to the next anniversary date of the policy. If he did this, he should have credited interest for the period between the date of the lapse and the next anniversary date because, as a result of the lapse and the proper application of the reserve, those loans were, in effect, paid on the day of the lapse, and it would be improper to charge interest beyond the date of payment.

At the very outset of this expert's calculations he found it necessary to determine the net annual premium on the policy and he stated that this amounted to $1.84, but when he gave the various calculations by which he arrived at this figure and these calculations were actually applied, the result showed that the figure, instead of being $1.84, amounted to $1.81. In his process of calculation he testified that, in figuring the annuity value, he had resorted to experience tables which are available and had fixed it at 1.7698, but, when shown other tables, he admitted that he had made an error and that the decimal point should be placed after the 7 rather than after the 1.

In at least two other portions of his testimony he admitted that he had made errors, in one place conceding that "you will find a little discrepancy in that first year," which discrepancy he contended had been corrected in his final calculations, and in another portion of his testimony he referred to another calculation and said that "for some unknown reason it is not exactly right."

We have diligently endeavored to follow the intricate calculations of Mr. Barthe and have found ourselves unable to do so. A reading of his testimony leads inevitably to the conclusion that he has made errors, any one of which might have been of sufficient importance to change the entire result reached by him. It is evident that even a slight increase in the reserve would have extended the policy beyond the date of death. He estimated that there had resulted a net reserve of $1.15, and, though at first stating that the annual premium had been $1.84, at another point he stated that it was $1.71. Conceding that it is $1.71, as he afterwards stated, a simple mathematical calculation shows that $2.91 would have been sufficient reserve to carry the policy beyond the date of death, so that it is evident that only approximately $1.75 additional reserve is required. The difference in the interest calculation, the difference in the allowance for reserve based on the increased value of the policy, or the correction of one or more of the minor errors made by Mr. Barthe, might easily have produced this additional amount of reserve.

In view of the positive testimony of Mr. Keetch that the reserve which should have been credited to the policy was several times that found by Mr. Barthe and because of our conclusion that where an insurer, in alloting reserve, adopts a method of its own, the burden is on it to prove that method and conclusively show that according to that method there is not sufficient reserve, we have reached the conclusion that there was here sufficient reserve to carry the policy beyond the date of death.

The judgment on the principal issue is, therefore, correct.

The judge, a quo, however, erred in including in the judgment an award of $25 as a fee for plaintiff's expert witness. There seems to have been no rule to tax this fee as costs. There should have been such a rule, as, on the trial of that rule, the expert would have been forced to appear and would have been subjected to examination and to cross-examination and countervailing proof could have been offered as to the value of his services.

In Egan v. Hotel Grunewald Company, Ltd. et al., 129 La. 163, 55 So. 750, 753, the Supreme Court refused to allow the fees claimed on behalf of some of the experts, saying:

"Some of the experts who testified did not appear on the trial of the rule to tax costs and submit themselves to an examination by defendants."

See, also, Cutitto v. Metropolitan Life Insurance Company, La.App., 172 So. 812. If the fee of this expert can be justified, the matter can be taken care of in a proper proceeding in the form of a rule to tax costs in the court a qua.

We think, however, that defendant-appellant should pay all costs.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be and it is amended by the elimination therefrom of the award of $25 to Grigsby Keetch as an expert's fee, and it is further ordered that, as thus amended, the judgment be and it is affirmed, at the cost of appellant.

Amended and affirmed.

WESTERFIELD, J., concurs in result.