### WILLIAMS v. PEOPLES INDUSTRIAL LIFE INS. CO. OF LOUISIANA.
#### No. 17028.

Court of Appeal of Louisiana. Orleans.
Oct. 16, 1939.

Rehearing Denied Nov. 13, 1939.
Writ of Certiorari Denied Jan. 9, 1940.

Herman L. Midlo, of New Orleans, for appellant.

Frank S. Normann and Harold M. Rouchell, both of New Orleans, for appellee.

WESTERFIELD, Judge.

Lizzie Williams, the plaintiff and appellant, is the beneficiary of an industrial life insurance policy issued by the Peoples Industrial Life Insurance Company of Louisiana, the defendant and appellee, for the principal sum of $75. The policy contained a provision that for every year it was kept in force an additional two percent of the face value would be added to the principal sum. The insured, Sam Williams, died January 12, 1938. The policy, which was issued on October 20th, 1924, lapsed for the nonpayment of premiums on October 3rd, 1932, or five years, three months, and nine days before the death of the assured. It is the contention of the plaintiff that the accumulated reserve upon the policy, at the time of its lapse, was sufficient to carry it beyond the date of the death of the assured, whereas, the defendant contends the contrary.

There is a stipulation of fact in the record from which it appears that the value of the policy at the time of its lapse was the sum of $87, and it is agreed that if the plaintiff is entitled to recover she should have judgment for that sum, together with six per cent interest per annum from January 12th, 1938. It is also agreed that the reserve on the policy at the time of its lapse, according to the standard adopted by the Company, the "Actuaries Combined Table of Mortality," amounted to $6.28, and that this sum is greater by thirty-six cents than would have been the case if the "American Experience Table of Mortality" had been used in calculating the reserve. In apportioning this reserve to the purchase of extended insurance, the defendant company used the "Sub-Standard Table of Mortality" with the result that the policy was carried in force for a period of four years, eleven months and twenty-five days, beyond the date of default in the payment of premiums, whereas if the "American Experience Table of Mortality" had been

used, the policy would have been extended for eight years, five months and four days. The assured died five years, three months and nine days after default.

In computing policy reserves, an insurer may adopt any standard provided it does not unfairly discriminate between policyholders and further provided that the resultant reserve is not less than would have been produced by the use of the American Experience Table of Mortality at four percent interest. Act No. 114 of 1898, as amended by Act No. 137 of 1938; Act No. 193 of 1906; Turner v. Peoples Industrial Life Insurance Company of Louisiana, La.App., 180 So. 435; Smith v. Unity Industrial Life Insurance Company, Inc., 184 So. 368. The defendant recognizes this situation and it points to the fact that the standard adopted by it developed thirty-six cents more than the required minimum, but it insists that there is no provision of law which requires it to apportion the reserve, when accumulated, in accordance with any particular table. In other words, though it is required to accumulate the reserve according to the American Experience Table of Mortality or by some other method producing an equal or greater value, it may apportion the reserve fund accumulated, according to any plan adopted by the company which does not discriminate between policyholders. The argument is, that if the Legislature had intended that the same method should be employed in the computation of the reserve and its apportionment, it would have said so by appropriate enactment.

Attention is called to the fact that Act No. 114 of 1898, Section 3, discloses the obvious purpose of preventing the distribution of dividends by insolvent insurance companies, since it requires that no dividends may be paid unless their assets exceed their liabilities, taking into account their reinsurance reserves computed upon the basis of the American Experience Table of Mortality. It is also said that Act No. 193 of 1906 permits insurance companies to deduct one-fifth of the accumulated reserve as a cash surrender value before apportioning it for the purchase of nonparticipating temporary insurance and that Act No. 57 of 1932 amending the Act of 1906 (section 2) "in addition to permitting the one-fifth surrender charge deduction * * * also permits, in the alternative, a $2.50 deduction for each $100.00 of the face of the policy, if said sum shall be

more than the said one-fifth". Moreover, Act No. 148 of 1936 permits industrial life insurance companies to deduct one-third of the reserve as a surrender charge. "Certainly", it is argued, "if the legislature intended the same uniformity to prevail for the apportioning of reserves as is required for accumulating reserves, the companies would not have been given the statutory right to vary the deductible cash surrender value as permitted by the non-forfeiture statutes".

Section 11 of Act No. 148 of 1936 reads as follows: "That from and after the passage of this Act, no policy of life or endowment insurance on the industrial plan (other than a term policy for twenty years or less), shall be issued or delivered in this State unless the same shall contain in substance the following provisions: That in the event of default of premium payments, after premiums have been paid for five years, the insured shall be entitled to a stipulated form of insurance, the net value of which shall be at least equal to two-thirds of the reserve on the policy at the date of default, from which any existing indebtedness to the company on or secured by the policy shall be deducted, provided, that the said reserve on the policy shall not be less than if computed in accordance with Act 114 of 1898, and that in computing paid up or extended insurance under this Section, the company may use single premiums based upon the Standard Industrial Table of Mortality with interest at not more than three and one-half percent per annum. Every such policy, subject to the same conditions as paid up and extended values, after the payment of premiums thereon for five full years, shall have a cash surrender value which shall be not less than the reserve that would be required for the aforesaid paid up or extended insurance after deducting all indebtedness as above provided."

█ This section, it is claimed, is complete authority for the proposition advanced by the defendant in that, it requires that the reserve shall be computed in accordance with the Act of 1898, that is to say, with a minimum benefit according to the American Experience Table of Mortality. But in computing the extended insurance "the company may use single premiums based upon the Standard Industrial Table of Mortality with interest at no more than three and one-half percent per annum". Whatever this statute may decree, it has no application to the present case because the policy under consideration was issued in 1924 long before the effective date of the act.

Counsel relies upon the case of Turner v. Peoples Industrial Life Insurance Company of Louisiana, supra. That case held, as we observed in Smith v. Unity Industrial Life Insurance Company, Inc., supra [184 So. 369], that: " * * * while Act No. 114 of 1898 required life insurance companies to set aside reserves computed upon either the actuaries or combined experience table of mortality or upon the American Experience Table of Mortality, such mandate had reference solely to the general reserve account, which every insurance company is compelled to set up on its books before it is permitted to apply any of its resources to the payment of dividends, and not to the actual reserves accumulated to the credit of any one policy according to the experience of the company. We further deduced that Act No. 193 of 1906, in speaking of the reserves on nonforfeitable policies being computed upon the standard adopted by the company, meant that the insurer was entitled to use, in calculating such actual reserves, a standard based upon its own business experience provided that such standard was fair as between all of its policyholders."

But, as we also said in the Smith case, we were mistaken in the Turner case, because:

"A reconsideration of the provisions contained in Act No. 114 of 1898 ànd those found in Act No. 193 of 1906 has convinced us that we were in error when we concluded in the Turner Case that the reinsurance reserve, required to be kept by insurance companies under the first statute, had absolutely no connection with the standards adopted by the companies, in computing the reserve, under the later nonforfeiture act. We are still persuaded that Act No. 193 of 1906 accords to the company the right to use any standard it chooses in computing reserves for extended insurance provided such standard does not discriminate unfairly between policyholders but we now hold that the standard adopted for such computation may not produce to the policyholder a smaller reserve than that established by a calculation based upon the American Experience Table of Mortality.

"We believe that the correctness of the view we now entertain is demonstrated by the provisions of Section 3 of Act No. 114

of 1898 which prohibits any insurance company from paying a dividend to either its stockholders or policyholders except under certain circumstances and further declares that:

"'But for all purposes the reinsurance reserve of every such company shall be computed upon the basis of the so-called "American Experience Table of Mortality," with interest at four per cent. per annum.'"

It is conceded that if the. assured, at the date of the lapse of the policy, had withdrawn its cash surrender value, he would have obtained the benefit of the accumulated reserve according to the American Experience Table of Mortality. It is only when that reserve, in default of an option being exercised by the insured, is used to purchase extended or term insurance that there is any contention that any different value is given to the policy and the right is claimed on behalf of the defendant insurance company to use such standard, as it may deem fit, in the estimation of the extended insurance—in the instant case, the "Sub-Standard Table of Mortality"—with the result that instead of obtaining extended or term insurance for eight years, five months and four days, the policy was extended only four years, eleven months and twenty-five days, or a little more than one-half the time which it would have been by the use of the American Experience Table of Mortality. If we adopt defendant's theory, and it must be admitted that there is no express statutory requirement making particular reference to the use of the accumulated reserve after it has been accumulated, the result would be to permit an insurance company to use any table it saw fit in the application of the accumulated reserve to extended insurance, subject only to the condition that it does not discriminate between the policyholders.

There is an agreement in this case, found in the stipulation of fact, that certain expert witnesses would testify to the effect that the "Sub-Standard Table of Mortality" is "a uniform table used by many insurance companies and is particularly used by companies which operate in the South in order to offset a differential in the extremely high death rate on negro risks. That the 'Sub-Standard Table of Mortality' is a recorgnized Mortality Table in the insurance field and permits the uniform apportionment of reserves to policyholders affected thereby fairly and in a uniform manner. That in this particular case this class of policyholder has the advantage of greater cash accumulations for surrender value purposes against a shorter period of extended insurance * * *. That it is not uncommon for insurance companies to accumulate policy reserves on one Table and apportion them on a different Table". It may be, as this evidence indicates, that it is customary in the insurance field to discriminate between White and Black policyholders and to employ one table for the accumulation of reserves and another table for their apportionment. We have no means of knowing the extent that this practice obtains, but in our judgment it is not an admirable one. If there exists a different mortality table based upon the color of the applicant and because of the greater mortality of the inferior race, in the absence of any statute prohibiting its use, we would see no objection to the issuance of policies to negroes upon a different and a higher rate of premium than similar policies were issued to Caucasians, and in that event we would expect the reserve, however accumulated, to be paid out to the policyholders in accordance with the mortality table under which the premiums were assessed, but here the law requires that the reserve must be accumulated no less advantageously to the assured than the American Experience Table of Mortality and it makes no distinction between the African and Caucasian policyholders. Incidentally, we may observe that according to the record the insured in this case paid twenty-five cents per week or thirteen dollars per year for a $75 policy, and in the eight years in which it was in force, he had paid $104, of which $6.28 was built up as a reserve. To apply this sum to the purchase of term insurance which, as counsel at the bar informed us, is nothing more than a bet of a certain sum of money against a smaller sum that the insured will live a given number of years, based upon a table of mortality about forty percent less advantageous to the insured than the one by which it was accumulated, does not appeal to our sense of fairness. In requiring that the reserve be built up by a certain Table of Mortality the law impliedly requires that the fund, so accumulated, be used to purchase term insurance by the same method of estimation of value as that by which it was accumulated. In using the words "standard adopted by the company", found in Section 2 of Act

No. 193 of 1906, it was contemplated that the standard adopted by the company in the accumulation of the reserve was to be used in the purchase of extended insurance. That section, after providing that the policy shall not lapse after it has been in force for three years because of the non-payment of premiums, declares that: "The reserve on such policy computed according to the *standard adopted by said company*, together with the value of any dividend additions upon said policy, after deducting any indebtedness to the company and one-fifth of the said entire reserve, shall upon demand with surrender of the policy be applied as a surrender value as agreed upon in the policy, provided that if no other option expressed in the policy be availed of by the owner thereof, the same without any further act on the part of the owner of the policy, shall be applied to continue the insurance in force at its full amount including any outstanding dividend additions less any outstanding indebtedness on the policy, so long as such surrender value will purchase non-participating temporary insurance at net single premium rates by the *standard adopted by the company*, at the age of the insured at the time of lapse or forfeiture * * *". (Italics ours)

We know of no authority directly in point and diligent counsel on both sides have found but one case which deals with the right of an insurance company to use a different table of mortality in the purchase of term insurance than that by which the reserve was accumulated. The case we refer to is that of Provident Savings Life Assurance Society of New York v. Bailey, decided by the Court of Appeals of Kentucky in 1904 and reported in 118 Ky. 36, 80 S.W. 452, 453. There the reserve had been calculated according to the American Experience Table of Mortality at four percent and amounted to $5.02. This sum, if calculated on the same mortality table, at the same rate of interest, would have extended the policy, under consideration in that case, one hundred ninety-four days or two days beyond the death of the assured. The defendant company, however, attempted to apply the "Actuaries. Experience Table" according to which the insurance would have been in force only one hundred eighty-four days beyond default, or eight days before the death of the assured. The Court said:

"The policy being silent as to the method or tables by which the extended insurance is to be calculated, parol evidence is competent to show what tables were then in use by the company; for it must be presumed that the parties contracted with reference to the tables which had been adopted by the company and were then in use by it. After the policy was issued, and the rights of the parties were fixed by it, the company was not at liberty, without the consent of the assured or the beneficiary in the policy, to adopt another table less favorable to the assured and more favorable to the company; for, if it could do this, instead of cutting the time down 10 days, it might thus cut it down one-half or more, and so deprive the insured of a very substantial part of his contract. It has been held that when a person applies to an insurance company for a policy he is presumed to apply for the form of policy in use by the company. The same rule must govern the insurance company when it issues a policy calling for extended insurance, and not defining by what tables the extended insurance is to be calculated. The parties must be presumed to contract with reference to the tables then in use, for else the policy would have no definite meaning; and after the policy is delivered the company cannot change its legal effect by any action of its, without the consent of the other parties to the contract."

It does not appear that the Bailey case has been cited in any other jurisdiction nor can we find similar cases, notwithstanding extensive research, nevertheless, we are convinced that the holding in that case is correct and we hasten to add our endorsement of the able opinion of the Court of Appeals of Kentucky.

For the reasons assigned the judgment appealed from is annulled, avoided and reversed and it is now ordered that there be judgment herein in favor of the plaintiff, Lizzie Williams, and against the defendant, Peoples Industrial Life Insurance Company of Louisiana, in the full sum of eighty-seven ($87.00) dollars together with six percent interest from January 12th, 1938.

Judgment reversed.